## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **BARBARA COSGROVE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.:  5:06-CV-2107-VEH** |
| | ) |
| **RAYTHEON COMPANY LONG** | ) |
| **TERM DISABILITY PLAN;** | ) |
| **RAYTHEON COMPANY, AS PLAN** | ) |
| **ADMINISTRATOR FOR THE** | ) |
| **RAYTHEON COMPANY LONG** | ) |
| **TERM DISABILITY PLAN;** | ) |
| **METROPOLITAN LIFE** | ) |
| **INSURANCE COMPANY,** | ) |
| | ) |
| **Defendants.** | ) |

---

## MEMORANDUM OPINION

## I.    INTRODUCTION

Plaintiff Barbara Cosgrove ("Cosgrove") initiated this Employee Retirement

Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA") case on October 19, 2006.

(Doc. #1).  The court has before it Defendants Raytheon Company Long Term

Disability Plan (the "Plan"), Raytheon Company ("Raytheon") and Metropolitan Life

Insurance Company's ("MetLife") Motion for Summary Judgment (Doc. #26) filed

on September 20, 2007.  Also pending before the court is Cosgrove's Motion for

Judgment (Doc. #28) filed on that same date.

In addressing the parties' competing summary judgment motions, this court must determine which standard of review applies and decide whether Cosgrove is entitled to ERISA benefits as a matter of law. As discussed more fully below, the court finds that Defendants' Motion for Summary Judgment is due to be granted and that Cosgrove's Motion for Judgment is due to be denied.

## II.   STATEMENT OF FACTS

### A.   Introduction and Plan Provisions

Cosgrove was employed by Raytheon as a Senior Program Cost Scheduler and Controller and was a participant in the Plan, which is governed by ERISA. AF No. 1.[1] Cosgrove's job consisted of working with Excel spreadsheets to interpret contract

---

[1] The designation "AF" stands for admitted fact and indicates a fact offered by Defendants that Cosgrove has admitted in her written submissions on summary judgment or by virtue of any other evidence offered in support of her case. Whenever Cosgrove has adequately disputed a fact offered by Defendants, the court has accepted Cosgrove's version. The court's numbering of admitted facts (*e.g.*, AF No. 1) corresponds to the numbering of Defendants' Statement of Undisputed Facts as set forth in Doc. #27 and responded to by Cosgrove in Doc. #32. A number following a decimal point corresponds to the particular sentence within the numbered statement of facts. For example, (AF No. 2.2) would indicate the second sentence of paragraph 2 of Defendants' Statement of Undisputed Facts is the subject of the court's citation to the record. Similarly, the designation "AAF" stands for additional admitted fact and corresponds to Cosgrove's Additional Material Facts contained in Doc. #32 and responded to by Defendants in Doc. #34. Any other facts referenced by the parties that require further clarification are dealt with later in the court's opinion.

financial numbers that were downloaded from Raytheon's central accounting system. AF No. 2.1.  It was an office job that required no lifting over 10 pounds, sitting 65% of the day, standing 15% of the day, walking 5% of the day, and involving "acute mental awareness" and "precise mental attention for the majority of the day."  AF No. 2.2.

The Plan is fully funded through after-tax contributions of the Plan participants (*i.e.*, Raytheon employees) that are held in the Trust.  AF No. 3.  The Plan vests exclusive discretionary authority to interpret its terms and provisions in Raytheon, as the Plan Administrator, and in the Claims Administrator.  AF No. 4.  More specifically, MetLife is the Claims Administrator and, under the Plan, is granted discretionary authority to interpret the terms of the Plan and to make final decisions with respect to paying claims:

> Determination of all claims for Benefits and questions which may arise under the Plan with respect to the payment of Benefits shall be made by the Claims Administrator in accordance with the provisions of the Plan and consistent with the Claims Administrator's fiduciary obligations. The Claims Administrator shall provide a full and fair review of any claim that is denied, in whole or part.  All decisions regarding claims for Benefits under the Plan shall be based on evidence satisfactory to the Claims Administrator.  The decisions of the Claims Administrator shall be conclusive and binding on all persons, unless a court of competent jurisdiction determines that such decision was arbitrary or capricious.

AF No. 5.

To qualify for benefits for the first eighteen (18) months following the date of disability (thirteen (13) weeks of short term disability ("STD") benefits and fifteen (15) months of long term disability ("LTD") benefits), a participant must demonstrate that she is "fully disabled."  AF No. 6.1.  This means that because of sickness or injury the participant "(i) cannot perform the essential elements and substantially all of the duties of his or her job with the Employer even with a reasonable accommodation; and (ii) is under the care of a Doctor."  AF No. 6.2.  Additionally, the participant must be under the care of a doctor for her full disability, continue to be fully disabled, and have not attained the Plan's maximum age for receiving benefits.  AF No. 7.

"Because MetLife administers both the STD and LTD plans, [a participant is] not required to submit a separate claim for LTD benefits.  AF No. 8.1.  While [a participant is] receiving STD benefits, MetLife remains in close contact with [the participant's] doctor to monitor [her] condition.  AF No. 8.2.  If [she] continue[s] to be disabled beyond 13 consecutive weeks, MetLife automatically converts [her] benefits to LTD benefits."  AF No. 8.3.

To qualify for LTD benefits after the eighteen (18) month period, a participant must demonstrate that she is "totally disabled," which means that because of sickness or injury "(i) A participant cannot do the essential elements and substantially all of

the duties of his or her job with the Employer even with a reasonable accommodation; and (ii) cannot do any other job for which he or she is fit by education, training or experience." AF No. 9. Additionally, the participant must be under the care of a doctor for her total disability, continue to be totally disabled, and have not attained the Plan's maximum age for receiving benefits. AF No. 10. To receive disability benefits, a participant must provide to MetLife "satisfactory and objective medical proof that [she is] disabled[.]" AF No. 11.

## B.    Cosgrove's Claim for Benefits in 2001

Cosgrove's last day of work at Raytheon was May 11, 2001, and she made a claim for disability benefits on May 14, 2001. AF No. 12. Cosgrove reported that, at some point prior to May 14, 2001, she had suffered a Cerebrovascular Accident (CVA) and, as a result, had a cognitive impairment which prevented her from working. AF No. 13.

MetLife requested Cosgrove's physicians complete a medical information form on her and provide office notes relating to her treatment. AF No. 14. On May 24, 2001, Cosgrove's primary care physician, Dr. Jack Englert, provided MetLife with information and office notes which indicated that Cosgrove had suffered a CVA. AF No. 15. Accordingly, Dr. Englert concluded that Cosgrove could not work and opined that "because of the area of the brain affected by the stroke her mental

capacity is now changed."  AF No. 16.

On May 31, 2001, Cosgrove was approved for STD benefits through August 9, 2001.   AF No. 17.  On July 29, 2001, MetLife received office notes from Dr. Englert.  AF No. 18.  Dr. Englert's July 13, 2001, office note indicated that Cosgrove had "loss of cognitive ability" with "maybe some minimal improvement."  AF No. 19.1.  It further stated that Cosgrove could not return to work until September 2001. AF No. 19.2.

Independent Physician Consultant, Dr. Jeffery Kahn, Board Certified in Physical Medicine and Rehabilitation, reviewed the administrative claim file and provided his written medical opinion on August 1, 2001.  AF No. 20.  Dr. Kahn was asked to comment (among other things) regarding the objective findings that were preventing Cosgrove from returning to work.  AF No. 21.  Dr. Kahn stated that where the problems were cognitive, as in Cosgrove's case, the "objective findings would be limited to a neurological examination focused on mental status, the performance of neuropsychological assessment, and the outcome of neuropsychological testing[,]" and also indicated:

> Based on [Cosgrove's] job description . . . and based on the documentation within the file, she has significant impairment of activities of daily living, and, clearly could not meet the 'acute mental alertness' requirements of her current job.

6

AF No. 22.1.

Dr. Kahn went on to say that disability to September 15, 2001, was not only warranted, "but the date could possibly even be extended beyond that time unless the claimant sufficiently recovers with regard to her cognitive impairments. In the absence of improvement in that area, return to work in any capacity may be difficult if not impossible." AF No. 22.2. Dr. Kahn noted that there were no objective findings in the medical records related to Cosgrove's report that she was suffering from cognitive problems, and that "in the absence of additional testing the degree of impairment and the likelihood of improvement cannot be further determined." AF No. 23.

Licensed psychologist, Dr. George M. Petty, completed MetLife's form requesting medical information on August 7, 2001. AF No. 24. Dr. Petty did not include any office notes or medical records and simply concluded that Cosgrove was "totally disabled" and her return to work date was "unknown." AF No. 25.

Cosgrove's thirteen weeks of STD benefits ended on August 9, 2001, and she began receiving LTD benefits on August 10, 2001. AF No. 26. Cosgrove saw neurologist Dr. Paul D. McDowell on August 14, 2001, who noted that she "still doesn't think she can work" and that he "would like for her to have formal psychometric testing to see if it can be verified that she is having significant cognitive

difficulties objectively."  AF No. 27.

Dr. Englert referred Cosgrove to licensed psychologist, Dr. Carol P. Walker, for an evaluation and testing of her cognitive functioning.  AF No. 28.  On August 23, 2001, Dr. Walker had an initial evaluation with Cosgrove, a report of which was provided to MetLife on or about August 31, 2001.  AF No. 29.

Dr. Walker's evaluation stated that Cosgrove "display[ed] excellent memory during the evaluation, including the ability to provide a chronological history of events since she was diagnosed with CVAs and the ability to document her memory problems.  AF No. 30.1.  This is a pattern that is not typically seen in organic damage but may arise from her perception of herself as significantly impaired and inefficient.  AF No. 30.2.  This may be contributing to a self-fulfilling prophecy.  AF No. 30.3.  [Cosgrove] has been scheduled for a full neuropsychological battery to ascertain cognitive status and to evaluate emotional functioning."  AF No. 30.4.

Dr. Walker reported Cosgrove's WAIS-III Full-Scale IQ as 86.  AAF No. 2.  Dr. Walker also noted that "[b]ased on the data from neuropsychological evaluation and clinical interview, in my opinion, [Cosgrove] is likely experiencing primarily an emotional reaction to psychological stress and to her worries and fears related to the diagnosis of CVA."  AAF No. 1.  Dr. Walker further indicated that while Cosgrove showed no particular strengths or weaknesses during her neuropsychological testing,

that her worst scores were on tasks requiring attention or concentration, that Cosgrove's "scores on measures of attention/concentration are mixed" and that "it is inconsistent with organic damage to have fluctuating abilities."  AAF No. 3.

On September 18, 2001, MetLife sent Cosgrove a letter informing her that her LTD benefits were terminated effective September 15, 2001.  AF No. 31.  Cosgrove was notified that she had sixty days to appeal this determination.  AF No. 32.

On October 4, 2001, MetLife contacted Dr. Walker seeking the neuropsychological testing she completed on Cosgrove in order to ascertain her cognitive status and her emotional functioning.  AF No. 33.  Dr. Walker's office informed MetLife that Cosgrove revoked permission to release that information to MetLife.  AF No. 34.

### C.    Review of Cosgrove's Appeal

Cosgrove did not file an appeal until January 1, 2002, more than 115 days after her benefits were terminated.  AF No. 35.  MetLife sent Cosgrove a letter, dated February 12, 2002, informing her that "since a written request for review was not received within 60 days of your receipt of the termination letter, MetLife will unfortunately not be able to conduct a review of your claim."  AF No. 36.  In a letter dated May 20, 2002, then counsel for Cosgrove, Evan A. Zagoria, requested that Cosgrove's appeal be treated as timely because she "had believed her doctor had resolved the 'appeal' issue by submitting additional records to support her disability

after September 15, 2001."  AF No. 37.

MetLife initially denied this request.  AF No. 38.  On August 13, 2002, Attorney Zagoria sent another letter requesting MetLife find good cause for Cosgrove's late filing of her appeal.  AF No. 39.  In that letter, Attorney Zagoria enclosed the results of Dr. Walker's neuropsychological testing from September 17, 2001, and October 3, 2001.  AF No. 40.1.  The raw data from Dr. Walker's testing was not provided.  AF No. 40.2.

MetLife agreed to review the new information to determine if Cosgrove's late appeal request was reasonable.  AF No. 41.  MetLife had independent physician consultant, Dr. Babbi J. Winegarden, a Board Certified Clinical Neuropsychologist, review Cosgrove's claim file and provide her written medical opinion.  AF No. 42.  Dr. Winegarden determined that, based on the information contained in Cosgrove's claim file, she "would not have trouble telling time or adhering to time limits" and that her neuropsychological data is consistent with right hemisphere and frontal damage.  AF No. 43.

On November 6, 2002, MetLife sent a letter to Attorney Zagoria stating that it had determined that Cosgrove's appeal was untimely and therefore it was unable to conduct a review of her claim.  AF No. 44.  Attorney Zagoria sent a letter to MetLife, dated November 7, 2002 (and received by MetLife on or about November 13, 2002), requesting MetLife consider an evaluation from Dr. John J. Blase which was prepared

for Cosgrove's Social Security Disability claim. AF No. 45.  Cosgrove has been found disabled by the Social Security Administration (the "Administration") although the record  before it and MetLife are not identical.[2]  AAF No. 10.

Dr. Blase, who was hired by Cosgrove's attorney to submit an opinion in support of her claim for Social Security disability benefits, had a different assessment of Cosgrove than the opinions of Dr. Walker, Dr. Winegarden, and Dr. O'Connor based on the same information and specifically found problems with Dr. Walker's results.  AAF No. 4.  Dr. Blase also interviewed Cosgrove.  (Doc. #30 at Ex. C at D0170).

Dr. Blase's report dated October 14, 2002, considered the raw data from Dr. Walker, found problems with Dr. Walker's findings because the testing she performed was improperly scored including one test being so "clearly aberrant" that "inspection alone" should have required it to be rescored, and concluded that Cosgrove's impairments were consistent with the MRI findings of left frontal and right frontoparietal infarcts.  AF No. 46.  More specifically, Dr. Blase noted that Dr. Walker administered only five of eleven portions of the Wechsler Memory Scale–Third Edition (WMS-III), and that a program marketed by Physiological

_____

[2]For example, Defendants suggest that the Administration was not aware of Dr. Winegarden's and Dr. O'Connor's conclusions about Cosgrove's claim:  that the testing performed by Dr. Walker was suspicious due to Cosgrove's lack of effort and further that there is no indication that the Administration knew that Dr. Walker believed that Cosgrove showed fluctuating effort.  (Doc. #34 at 3 ¶ 10).

Assessment Resources incorrectly imputed the MMPI-2 testing data.  AAF No. 5.  Dr. Blase further opined that Dr. Walker's conclusions ignored the fact Cosgrove experienced two CVAs.  AAF No. 6.

Dr. Blase also found "profound" verbal memory deficits and "very significant" visual memory deficits, and he estimated a 24 point loss of IQ.  AAF No. 7.  Dr. Blase concluded that Ms. Cosgrove's test scores were consistent with frontal lobe involvement and indicated a significant decline in higher level cognitive processing and executive functioning skills.  AAF No. 8.

Attorney Zagoria called MetLife on November 13, 2002.  AF No. 47.1.  Attorney Zagoira agreed to provide the raw data from Dr. Walker's testing and MetLife agreed to have Dr. Winegarden prepare an addendum to her medical report after reviewing the data.  AF No. 47.2.  On January 2, 2003, Attorney Zagoria sent a letter to MetLife enclosing a letter from Dr. Walker which confirmed that the raw data from Cosgrove's testing had been sent directly to Dr. Winegarden.  AF No. 48.

After reviewing the raw data and speaking with Dr. Walker, Dr. Winegarden opined that Cosgrove "would not have had difficulties adhering to time limits, nor organizing a written report."  AF No. 49.  Dr. Winegarden's report notes:  "there is inconsistency within the test results.  AF No. 50.1.  These findings call into question all of the test results.  AF No. 50.2.  Keeping this in mind, the test results suggest that [Cosgrove] is functioning at least within the average range intellectually."  AF No.

50.3.

Dr. Winegarden also reported about her teleconference with Dr. Walker in which Dr. Walker "reiterated her position that [Cosgrove's] symptoms were likely the result of psychological and motivational factors.  In addition [Dr. Walker] had spoken to the PT [physical therapy] and OT [occupational therapy] team members and they indicated that [Cosgrove] was inconsistent in her abilities with them as well, being able to perform harder tasks but not the easier ones. . . . [Dr. Walker] indicated that there was no evidence at that time that [Cosgrove] could not have followed through with the appeal."  AF No. 51.

MetLife notified Attorney Zagoria, by letter dated March 5, 2003, that MetLife was not able to conduct a review of Cosgrove's claim due to the untimely filing of her appeal request because, based on the information obtained by Dr. Walker and reviewed by Dr. Winegarden, there was no evidence that she could not have timely filed her appeal.  AF No. 52.  Subsequently on January 28, 2004, Cosgrove filed her first lawsuit against Defendants.  *See Cosgrove v. Raytheon Company Long Term Disability Plan, et al. ("Cosgrove I")*, 5:04-CV-0149-CLS, Doc. #1.

On August 2, 2004, Defendants moved for summary judgment in *Cosgrove I* on the issue of whether Cosgrove had filed a timely appeal.  5:04-CV-0149-CLS, Doc. #19.  On March 27, 2006, Judge C. Lynwood Smith, Jr. denied Defendants' Motion for Summary Judgment (*see Cosgrove I*, Docs. #37, #38), and the parties

agreed to dismiss *Cosgrove I* without prejudice and to remand the claim to MetLife to determine the issue of Cosgrove's disability.  AF No. 53.

### D.     MetLife's Review After Remand

On June 23, 2006, Cosgrove, through her current attorney Eric Buchanan, submitted exhibits to MetLife for review of Cosgrove's claim for LTD benefits, which included the following documentation: (1) vocational evaluation from Mark Boatner; (2) Dr. Hitchcock's medical records; (3) Dr. Englert's sworn statement, medical records, curriculum vitae, and letters; (4) records from Trinity Counseling; (5) Social Security decision; (6) Dr. Walker's evaluation; (7) Dr. Petty's medical assessment forms; (8) Dr. McDowell's medical assessment forms and medical records; (9) Dr. Sharp's letters to Dr. Englert; (10) Huntsville Cardiovascular Clinic, P.C.'s medical records; (11) Crestwood Medical Center's medical records; (12) HealthSouth's medical records; (13) Eye Care Associates' medical records; and (14) South Huntsville Family Practice's medical records.  AF No. 54.

Part of the records submitted included a medical opinion form (physical) from Dr. Englert dated May 7, 2006, which stated "Remember . . . This is a cognitive problem not a physical ability problem.  If she can [sic] remember to be there [*i.e.*, at work].  The body is able.  The mind is not." AF No. 55.  As part of the appeals process, MetLife had Cosgrove's claim file reviewed by two independent physician consultants, Dr. Janet Collins and Dr. Margaret O'Connor.   AF No. 56.

Dr. Collins, Board Certified in Occupational and Environmental Medicine, reviewed Cosgrove's file and provided her medical opinion with respect to any physical impairments or disabilities, and issues of level of function and specific limitations and/or restrictions in the workplace.   AF No. 57.  Dr. Collins noted that Cosgrove's disability claim is due to "reasons of psychological and neurocognitive deficits and not due to physical/medical causes[,]" stated that she did not review Cosgrove's records for cognitive issues but only for physical impairments, and overall could "find no consistent objective data in the available file that would support the existence of a physical/medical impairment that would have precluded the performing of the essential functions of a sedentary to light work for the time period in question."  AF No. 58.

Dr. Collins contacted Cosgrove's primary care physician, Dr. Englert, in an effort to perform a teleconference, but was informed by his office staff that he was unavailable.  AF No. 59.  Dr. Collins asked Dr. Englert's office staff if she could provide Dr. Englert with a specific question and have him return her phone call.  AF No. 60.1.  The question was whether or not there were any objective findings to support physical/medical restrictions and limitations that the patient had, realizing that Dr. Englert felt, based on the information he submitted, that her disability was largely due to cognitive defects.  AF No. 60.2.  Dr. Englert did not return Dr. Collins's phone call or otherwise respond to her question.  AF No. 60.3.

Dr. O'Connor, Board Certified in Neuropsychology, reviewed Cosgrove's file with the possible exceptions of Dr. Blase's report and Dr. Englert's sworn statement[3] and provided her medical opinion regarding Cosgrove's neuropsychological functions.  AF No. 61.1.  Dr. O'Connor opined that there was "no objective data on file indicating that [Cosgrove] has cognitive limitations that would affect her work status."  AF No. 61.2.

Dr. O'Connor also reported speaking with Dr. Walker via teleconference, and Dr. Walker stated that, based on the testing,[4] "she believed that [Cosgrove] did not have neuropsychological deficits that would affect her work abilities."  AF No. 64. Dr. O'Connor also attempted to contact Dr. Englert on three separate occasions, but Dr. Englert did not return her phone calls.  AF No. 65.

On August 28, 2006, MetLife sent a copy of the independent physician consultant reports from Dr. O'Connor and Dr. Collins to both Dr. Englert and Dr.

---

[3]Neither Dr. Blase's report nor Dr. Englert's sworn statement is specifically listed on Dr. O'Connor's report as documents that she reviewed.  However, Dr. O'Connor's report indicates that she did review Boatner's vocational evaluation of Cosgrove, which included the material portions of Dr. Blase's report.  *Compare* Doc. #30 at Ex. C at D0168-D0171 *with id.* at D384-D387.  Moreover, Dr. O'Connor's opinion does expressly address Dr. Blase's findings.  (*See, e.g.*, Doc. #30 at Ex. C at D366 ("As noted Ms. Cosgrove's effort during that evaluation [*i.e.*, cognitive testing with Dr. Walker] was deemed inadequate; it is not clear whether Dr. Blase was aware that Ms. Cosgrove's effort had not been adequate.").

[4]Cosgrove points out that at the time of the conversation, Dr. Walker had not seen her in several years and may not have known about the criticisms that her test results were invalid.

Walker.  AF No. 66.  MetLife asked that Cosgrove's physicians review the reports

and offer any comments and opinions regarding her functionality.  AF No. 67.1.

However, neither Dr. Englert nor Dr. Walker replied.  AF No. 67.2.

On September 14, 2006, MetLife wrote to Cosgrove's counsel, explaining that:

Based upon our review of the information contained in your client's file,
we have determined that the information does not support the severity
of impairment that would render her unable to perform the essential
elements of her job beyond September 15, 2001.  There is no consistent
objective data contained in the file that would preclude your client from
performing the essential functions of her job based upon a physical
condition[.]  In addition, [there] was no objective data contained in the
file indicating that the employee has cognitive limitation that would
affect her work ability from a psychiatric condition. . . . Therefore, we
find the decision to disallow her Long Term Disability claim for benefits
beyond [September 15, 2001] remains in effect.

AF No. 68.  On October 19, 2006, Cosgrove filed her complaint in this action seeking

further LTD benefits under the Plan.  AF No. 69.

## III.   BURDEN ON SUMMARY JUDGMENT[5]

---

[5]Because the court's role in ERISA cases is more akin to an appellate one, the
scope of its review on summary judgment is notably different than when it sits as a
trial court. *See, e.g., Crume v. Metropolitan Life Ins. Co.*, 417 F. Supp. 2d 1258, 1272
(M.D. Fla.  2006) ("'Whe[n] the decision to grant or deny benefits is reviewed for
abuse of discretion, a motion for summary judgment is merely the conduit to bring the
legal question before the district court and the usual tests of summary judgment, such
as whether a genuine dispute of material fact exists, do not apply.'" (citations
omitted); *Providence v. Hartford Life & Accident Ins. Co.*, 357 F. Supp. 2d 1341,
1342 n.1 (M.D. Fla. 2005) ("[T]he Court's task is to review the benefit decision based
on the administrative record available to the decision maker at the time he or she
made the decision.") (citation omitted).

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *See id.* at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable [trier of fact] could [find] for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

Although there are cross-motions for summary judgment, each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law. *See Chambers & Co. v. Equitable Life Assur. Soc. of the U.S.*, 224 F.2d 338, 345 (5th Cir. 1955); *Matter of Lanting*, 198 B.R. 817, 820 (Bankr. N.D. Ala. 1996). Therefore, the court will consider each motion independently, and in accordance with the Rule 56 standard. *See Matsushita Elec. Indus. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). "The fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit." *See* WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2720, at 327-28 (3d ed. 1998). Also, these are the facts for summary judgment purposes only; they may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.'") (citation omitted).

## IV.   ANALYSIS

### A.   Standard of ERISA Review

This ERISA case involves the review of a denial of a claim for LTD benefits

under the Plan.[6]  (Doc. #1 ¶ 6).  As stated above, MetLife serves as the Claims Administrator of the Plan and is bestowed with discretionary authority to administer claims under the Plan.  "Plaintiff concedes that the proper standard of review is the arbitrary and capricious standard."  (Doc. #32 at 9).  Accordingly, the parties are in

---

[6]In *Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132 (11th Cir. 2004), the Eleventh Circuit set forth a six-step model for use in judicially reviewing virtually all ERISA denials:

(1)   Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision; if it is not, then end the inquiry and affirm the decision.

(2)   If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3)   If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4)   If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5)   If there is no conflict, then end the inquiry and affirm the decision.

(6)   If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Williams*, 373 F.3d at 1138 (footnotes omitted).

agreement that the arbitrary and capricious standard of review applies to this case.

### B.    Burden of Persuasion

The parties dispute who has the burden of persuasion, citing to a variety of cases.  Defendants are correct that in the Eleventh Circuit, the burden of persuasion remains with Cosgrove even though she has received a period of STD benefits and a period of LTD benefits under the Plan.  *See Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) (recognizing that ERISA claimant has burden of establishing disability).

More specifically, as recently summarized by the Eleventh Circuit regarding the burden of persuasion in ERISA benefit cases:

> Stiltz also argues that MetLife's payment of disability benefits for nearly two years should weigh against its decision to discontinue benefits.  **We have never held that such a fact is a relevant consideration when we review the denial of benefits under ERISA.**  Even if we were to consider the previous payment of benefits by MetLife, it would not change our conclusion. The record reflects that many of Stiltz's wide-ranging complaints, such as irritable bowel symptoms and a sleep disorder, were successfully treated after he first filed for disability benefits.  That MetLife allowed Stiltz so much time to produce evidence of his inability to work and that he still failed to do so supports the determination by MetLife.

*Stiltz v. Metropolitan Life Ins. Co.*, No. 06-15180, 2007 WL 1600036, at *5 (11th Cir. Jun. 5, 2007) (emphasis added).  Similar to Cosgrove's situation, in *Stiltz* the plaintiff had "applied for and eventually received short-term and long-term disability benefits from MetLife."  2007 WL 1600036, at *1.  Therefore and consistent with the

21

Eleventh Circuit's restatement of the claimant's burden in *Stiltz*, this court will evaluate MetLife's denial of benefits bearing in mind Cosgrove's evidentiary burden to establish her right to LTD benefits, regardless of MetLife's prior treatment of her disability claim.

### C. Application

#### 1. The court affirms MetLife's decision applying a *de novo* review.

Following the *Williams* framework set forth above, the first step for the court to consider is whether MetLife's determination of no disability is legally correct or legally wrong. Based upon its review of the entire administrative record, the court concludes that MetLife's decision to terminate LTD benefits to Cosgrove effective September 15, 2001, is correct because the evidence relied upon by Cosgrove does not establish adequate proof of her disabled status as defined by the Plan. More specifically, Cosgrove lacks adequate objective evidence to substantiate her claim.

For example, while Cosgrove challenges Dr. Walker's findings as to her cognitive abilities as unreliable, during the time in which her claim was on remand to MetLife, Cosgrove did not ever offer any alternative cognitive testing or other objective evidence to respond to the results. The closest that Cosgrove comes to challenging Dr. Walker's evaluation is through Dr. Blase's critique of Dr. Walker's testing; however, there is no evidence in record showing that Dr. Blase retested

Cosgrove.  Instead, Dr. Blase merely reached a different conclusion based upon the same set of raw data that was used by Dr. Walker, and portions of which were subsequently reported as "seriously suspect" by Dr. Winegarden in February 2003. (Doc. #30 at Ex. C at D0154 ("Given the above findings with regard to [Cosgrove's] effort, the rest of the test data are seriously suspect.")).  Therefore, Dr. Blase's report based upon Dr. Walker's potentially tainted testing data is insufficient to meet Cosgrove's burden under the Plan of objectively showing her disabled status.[7]

Cosgrove also relies upon her favorable Social Security determination with the Administration dated February 25, 2004, as support for her disability claim. For several reasons, the Administration's favorable determination is not persuasive, much less controlling, as to Cosgrove's ERISA claim.  First, the United States Supreme Court has cautioned the lower courts about the marked differences between Administration determinations and those conducted in relation to ERISA plans. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832-33 (2003); *see also Whatley v. CNA Ins. Co.*, 189 F.3d 1310, 1314 n.8 (11th Cir. 1999); *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1452 n.5 (11th Cir. 1997) (clarifying that disability determinations under Social Security regulations, while subject to

---

[7]Relatedly, the vocational evaluation offered by Boatner in support of Cosgrove's disability claim is similarly questionable because Boatner relies on the report of Dr. Blase in arriving at his vocational assessment.  Moreover, the vocational report does not constitute objective evidence of cognitive deficits; rather, it presumes them based upon Dr. Blase's statement.

consideration, are not dispositive under ERISA-covered plans).

Second, the relevant time periods are distinguishable. The Social Security decision dated February 25, 2004, found Cosgrove to be disabled as of March 9, 2001. In contrast, MetLife's decision on remand dated September 14, 2006, which upheld its initial decision to terminate Cosgrove's LTD benefits effective September 15, 2001, was issued over two (2) years after the Administration's determination. Third, the records before the Administration did not include some of the materials, including Dr. Winegarden's addendum and Dr. O'Connor's report, that were before MetLife. Consequently, the material evidence reviewed for each claim was significantly different, which makes any attempt to draw a comparison of the two determinations even less helpful.

Cosgrove also maintains that her case is akin to *Oliver v. Coca-Cola Co.*, 497 F.3d 1181 (11th Cir. 2007), *rehearing granted and opinion vacated in part on other grounds by Oliver v. Coca Cola Co.*, Nos. 05-17072, 05-16509, 2007 WL 3274933 (11th Cir. Nov. 06, 2007):

> By relying on Dr. Goldberg's flawed peer review as a basis for denying Oliver's LTD benefits claim, and by failing to review relevant medical evidence that supported Oliver's claim, Coca-Cola acted arbitrarily and capriciously. Though courts may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation," plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S. Ct. 1965,

> 1972, 155 L. Ed. 2d 1034 (2003). Here, Oliver presented Broadspire
> and Coca-Cola with a plethora of medical evidence in support of his
> disability claim. Coca-Cola denied Oliver's claim not on the basis of
> conflicting, reliable evidence-a practice we have upheld, *see Shaw v.
> Conn. Gen. Life Ins. Co.*, 353 F.3d 1276, 1287 (11th Cir. 2003)-rather,
> it simply ignored relevant medical evidence in order to arrive at the
> conclusion it desired.

*Oliver*, 497 F.3d at 1199. For many reasons, Cosgrove's case is distinguishable from

Oliver's.

As an initial matter, the plan at issue in *Oliver* did not include an express

objective evidence provision. *Id.*, 497 F.3d at 1196 ("Moreover, to receive those

benefits, a disabled participant is required only to submit a 'written application on a

form provided by his Employer,' and provide 'medical certification' of his disability.

Neither § 3.1 nor any other provision of the Plan requires 'objective evidence' of a

disability."). Moreover as the Eleventh Circuit explained, the disabling pain that

Oliver suffered with stemming from his conditions of chronic radiculopathy and

fibromyalgia was not susceptible to objective measurement. *Id.* ("Yet much medical

evidence, especially as it relates to pain, is inherently 'subjective' in that it cannot be

quantifiably measured."). In Cosgrove's case, no one has suggested that proof of

disabling cognitive dysfunction is subjective, rather than objective.

Also in contrast to Oliver, Cosgrove has not presented MetLife "with a plethora

of medical evidence in support of [her] disability claim." *Id.* Similarly, this case is

not one in which the evidence "greatly preponderates in one direction." *Brown v.*

*Blue Cross and Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1566 n.11 (11th Cir. 1990). Instead, Cosgrove's own medical evidence, including in particular Dr. Walker's assessment of her, does not unequivocally or objectively establish cognitive disability for the period beginning September 16, 2001.[8]

Therefore, this court views this case as one closer to *Shaw* because MetLife has denied Cosgrove's claim "on the basis of conflicting, reliable evidence[.]" Additionally, "[t]hat MetLife allowed [Cosgrove] so much time to produce evidence of h[er] inability to work and that [s]he still failed to do so supports the determination by MetLife." *Stiltz*, 2007 WL 1600036, at *5.

Finally, although Cosgrove concedes that the court should evaluate MetLife's decision under an abuse of discretion standard, she attempts to interject a conflict of interest analysis or heightened review of MetLife's actions. (Doc. #28 at 20-21). More specifically, Cosgrove points to Dr. O'Connor's affiliation with NMR and NMR's ongoing business relationship with MetLife and urges this court to conclude that an improper motive tainted the decision-making process due to NMR's financial incentive to save MetLife money. (Doc. #28 at 21). In making this argument, however, Cosgrove provides no controlling authority which has held that the type of

---

[8]Similarly, Cosgrove relies upon Dr. Kahn's opinion in support of her disability claim, but it predates any cognitive testing and regardless, does not objectively support a finding of disability from September 16, 2001, forward. The same is true of Dr. Petty's report.

business arrangement shared between MetLife and NMR creates a cognizable conflict of interest in the reviews performed by NMR doctors.  Moreover, even applying Cosgrove's theory, MetLife's decision is still *de novo* correct because other evidence besides the report of Dr. O'Connor supports it.

> **2.**   **Alternatively, even if MetLife's decision was *de novo* wrong, reasonable grounds in the record otherwise support it.**

The arbitrary and capricious standard of review, which applies to this claim decision, is the most deferential one under ERISA.  Application of this least stringent standard means that a court must affirm even a wrong, but reasonable, disability decision.

Therefore, even presuming the existence of a legally incorrect determination, MetLife's conclusion of no disability is due to be upheld under the pure arbitrary and capricious standard because reasonable grounds within the record support it.  As discussed above, this is not a situation similar to *Oliver*, in which the claims administrator simply chose to ignore a plethora of evidence favorable to Cosgrove or failed to investigate fully and fairly.

Instead, even the medical evidence relied upon by Cosgrove contains conflicting information about whether she disabled, such as the cognitive report of Dr. Walker and Dr. Walker's impressions of Cosgrove, as reported in her conversation with Dr. Winegarden, in which she indicated that Cosgrove's

"symptoms were likely the result of psychological and motivational [as opposed to cognitive] factors" and that Cosgrove's therapy staff who worked with her reported inconsistencies in her abilities.  Similarly, Dr. Walker indicated to Dr. O'Connor in a separate telephone conference that she believed that Cosgrove did not have the neuropsychological deficits that would affect her work abilities.

Moreover, MetLife gave Dr. Walker an opportunity to respond to the addendum (dated February 27, 2003) to Dr. Winegarden's report (dated October 22, 2002) and to Dr. O'Connor's report (dated July 28, 2006), while Cosgrove's claim was on remand, but she never did.[9]  Nor did Cosgrove offer supplemental testing or other evidence to (1) refute Dr. Winegarden's additional findings of potential malingering and test data of a seriously suspect nature or (2) Dr. O'Connor's opinion that no objective data existed which substantiated Cosgrove's cognitive limitations that would affect her ability to work.

As Cosgrove bears the burden of proving her disabled status, it was incumbent upon her to show with objective evidence that she suffered from cognitive difficulties which prevented her from working.  Based upon the record, MetLife acted reasonably when it concluded that the only objective testing offered by Cosgrove (through Dr. Walker) was suspect, and therefore was insufficient to prove her disabled status.

---

[9]Dr. Englert, who gave a sworn statement on May 31, 2006, in support of Cosgrove's claim, was given a similar opportunity to respond to both reports, but he never did.

Accordingly, reasonable grounds support MetLife's decision to terminate Cosgrove's LTD benefits, which under *Williams* means that, in the alternative, the disability determination adverse to Cosgrove is due to be affirmed, even if it was legally incorrect.

## V.   CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is due to be granted, and Cosgrove's Motion for Judgment is due to be denied.  The court will enter an order consistent with this memorandum decision.

**DONE** and **ORDERED** this the 13th day of November, 2007.

_____
**VIRGINIA EMERSON HOPKINS**
United States District Judge